**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JIMMIE MARSHALL,

      Plaintiff - Appellee,

v.

COLUMBIA LEA REGIONAL
HOSPITAL; JANE DOE, Nurse; CITY
OF HOBBS; TONY KNOTT, Captain,

      Defendants,

WALTER ROYE, Sergeant; RODNEY
PORTER, Officer,

      Defendants - Appellants.

No. 05-2173

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-99-1363 LH/LCS)**

---

Edward Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New
Mexico, for Defendants-Appellants.

Robert J. Gorence, Gorence & Oliveros, Albuquerque, New Mexico for Plaintiff-
Appellee.

---

Before **HENRY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

**HENRY**, Circuit Judge.

City of Hobbs, New Mexico, police officers Rodney Porter and Sergeant Walter Pope, appeal a jury verdict in favor of plaintiff Jimmie Marshall for violation of his Fourth Amendment right to be free of unreasonable search and seizure. The officers do not dispute that they violated Mr. Marshall's Fourth Amendment rights when they ordered a warrantless, nonconsensual blood test for an alleged misdemeanor. Nevertheless, the officers contend the district court erred in denying their post-verdict motion for judgment as a matter of law based on qualified immunity because no clearly established law precluded the test. We affirm the district court.

## I. BACKGROUND

A. Factual history

We described the factual history of this case – including some of the troubles of the City's police department – in *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157 (10th Cir. 2003) ("*Marshall I*"):

> On December 26, 1996, Mr. Marshall, an African-American self-employed electrician, was driving his gold Toyota pickup in Hobbs, New Mexico, when he noticed a police car parked by the side of the road with its lights off. According to Mr. Marshall, the police officer–later identified as Officer Rodney Porter–followed his pickup for several blocks. While Mr. Marshall was stopped at an intersection with his left-turn signal blinking, Officer Porter pulled up alongside the pickup and "gaz[ed] intently at [Marshall's] face," which Marshall

2

infers was for the purpose of ascertaining his race. Officer Porter contends that Mr. Marshall failed to stop at the stop sign, which Mr. Marshall denies.

Officer Porter then activated his emergency lights, but Mr. Marshall continued to drive for more than two miles before coming to a stop at his residence. Mr. Marshall claims that he evaded the officer for several miles because he was fearful to stop his vehicle outside of the presence of witnesses, on account of the reputation of the Hobbs Police Department for racist practices. At that time, Mr. Marshall did not know Officer Porter and did not have any information about him. In the criminal complaint filed as a result of the incident, Officer Porter stated that Mr. Marshall accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, which Marshall denies. However, Officer Porter made no mention of these allegations in the affidavit he filed in this case describing the events of December 26, 1996, nor were they mentioned in Defendants' later pleadings.

On the street in front of Mr. Marshall's residence, the two men emerged from their vehicles. Officer Porter had drawn his pistol. His first words were to accuse Mr. Marshall of being on crack, which Marshall has consistently denied. Defendants have proffered no evidence in support of this accusation. Officer Porter states that Mr. Marshall had the odor of alcohol on his breath, which Marshall does not deny, stating that he had imbibed one drink with his brother Alfred. Officer Porter arrested Mr. Marshall on various charges, including the traffic violation, driving under the influence, and resisting arrest. On the written citation form, in the space for indicating the gender of the person receiving the citation, Officer Porter wrote "B/M," presumably meaning black male.

After arresting Mr. Marshall, Officer Porter proceeded to search Marshall's truck. The search revealed a .40 caliber pistol under the driver's seat (apparently lawful), and Officer Porter claimed also to have found a small amount of a "green leafy substance," a contention Marshall denies. Mr. Marshall was taken to the city jail, where several sobriety tests were performed on him. Mr. Marshall passed two breathalyzer tests, but had difficulty completing the recitation of the alphabet (the "ABC test"). There is conflicting testimony about whether the horizontal gaze stymosis test was administered, and whether Mr. Marshall passed the finger-number test.

3

Officer Porter then transported Mr. Marshall to the Columbia Lea Regional Hospital for blood testing. Mr. Marshall claims his request to put on his shoes was refused, despite the winter weather, and that his socks became soaked with urine that had pooled on the back floor of the police car. While waiting for Sergeant Roye to arrive at the hospital, Officer Porter interrogated the handcuffed Mr. Marshall for over twenty minutes, again accusing him of being on crack. ("I know you came from a crack house. You might as well admit it, because I know you went there to get some crack.") During this interrogation Mr. Marshall stated that the blood test might test positive for marijuana.

Thereafter, Sergeant Roye and Nurse Iris Goad entered the room. When Nurse Goad approached Mr. Marshall, he said, "Ma'am, you don't have my consent oral or written to take my blood. But if you're going-and I rather you not stick me with that needle. But if you're go going to take my blood, I'm not going to resist, but you don't have my consent oral or written." At that point Sergeant Roye told Nurse Goad, "Go-ahead and give it to him. I'll consent." Mr. Marshall then held his handcuffed arms in front of him for the blood test. The record contains a "consent form," initialed by Officer Porter, which states: "Refused to sign. Gave verbal consent." Two vials of blood were taken. The laboratory tests subsequently found no evidence of alcohol or other illegal drugs, but revealed the presence of THC, the active ingredient in marijuana, in Marshall's bloodstream.

After the events in the hospital, Mr. Marshall was returned to the jail, where he was confined for several hours before his mother obtained his release on bail. Later, he was charged in a criminal complaint with (i) possession of a controlled substance (marijuana), (ii) resisting, evading or obstructing a police officer, (iii) negligent use of a firearm (possession while intoxicated), (iv) reckless driving, (v) running a stop sign, and (vi) driving under the influence. In May 1997, the DA entered a *nolle prosequi* because the evidence obtained in the case had been suppressed. The record does not contain any further information about that proceeding, or the legal basis for the suppression of the evidence.

*Id.* at 1161 (citations omitted).

B. Procedural history

In November 1999, Mr. Marshall filed a § 1983 action in federal district

4

court against the officers, the police chief, the hospital, and the nurse who administered the blood test. In June 2002, the district court granted summary judgment for the defendants. In *Marshall I*, we reversed the district court in part, holding that critical questions of fact remained with respect to Mr. Marshall's Equal Protection, Fourth Amendment, and related state-law claims against the officers and the City. *Id.* at 1181.

On remand, the district court held a bifurcated trial. In the first phase of the trial, which involved claims against the officers, the jury rendered a special verdict in favor of Mr. Marshall on his Fourth Amendment claim against Officers Porter and Roye. The jury awarded Mr. Marshall compensatory damages of $90,000 from both Officer Porter and Officer Roye, and punitive damages in the amount of $300,000 against Officer Porter and $100,000 against Officer Roye.

In the second phase, the court granted judgment as a matter of law to the City on the supervisory and municipal liability claims. Following entry of judgment, the officers filed a renewed motion for judgment as a matter of law based on qualified immunity. The district court denied the motion.

## II. DISCUSSION

The officers contend that the district court erred when it denied their post-judgment motion for judgment as a matter of law based on qualified immunity. They maintain that, at the time they ordered the nurse to draw Mr. Marshall's

blood against his will, no clearly established law precluded a warrantless nonconsensual blood test. Hence, they argue that they are entitled to qualified immunity.

A. Standard of review

We review de novo a district court's denial of a motion for judgment as a matter of law. *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006). The Supreme Court has recognized that qualified immunity embodies "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

1. Rule 50(a) pre-verdict motion requirements.

We begin by sua sponte addressing one procedural hurdle. Although the officers raised the qualified immunity defense in their answer to Mr. Marshall's amended complaint, in their motion for summary judgment prior to the first appeal in this case, and later in their post-verdict motion for judgment as a matter of law under Rule 50(b)(1)(C), the officers apparently did not raise qualified immunity in their pre-verdict Rule 50(a) motion,[1] which is a prerequisite to a

---

[1] Rule 50 provides in pertinent part:

Rule 50. Judgment as a Matter of Law in Jury Trials; Alternative
(continued...)

6

post-verdict motion under Rule 50(b).[2]  The renewed motion under Rule 50(b)

[1](...continued)
Motion for New Trial; Conditional Rulings

a) Judgment as a Matter of Law.

(1) If *during a trial* by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law *may be made at any time before submission of the case to the jury.* Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The *movant may renew* its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment–and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1)  if a verdict was returned:
      (A) allow the judgment to stand,
      (B) order a new trial, or
      (C) direct entry of judgment as a matter of law.

FED. R. CIV. P. 50(a)-(b)(1) (emphasis added).

[2]  The transcript of the officers' pre-verdict Rule 50(a) motion reads as follows:

(continued...)

cannot assert grounds for relief not asserted in the original motion. *See Anderson v. United Tel. Co.*, 933 F.2d 1500, 1503 (10th Cir. 1991) (using the "directed verdict" and "judgment n.o.v." nomenclature of Rule 50 prior to its amendment in 1991); *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) ("In sum, a posttrial motion for judgment as a matter of law can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury."). "To hold otherwise would be in contravention of the purposes of Rule 50(a)." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1115 (10th Cir. 2005).

The provisions of Rule 50(a) and (b) thus serve two purposes: they

---

[2](...continued)
I think the most I can tell you is that I respectfully disagree with the Tenth Circuit's interpretation of *Schmerber* and its application of the facts of this case. I'm not sure there is a whole lot we can do about that with this case. The facts haven't changed, although I would add that I think that this Court would find that based upon the testimony and lack of credibility thereof coming from the plaintiff, no reasonable juror could find that Mr. Marshall had his blood taken against his will and that he didn't voluntarily give a sample of his blood . . . .

And with respect to the claim against Rodney Porter, again, the substance of the evidence is simply that if in the light most favorable to Mr. Marshall that he pulled up next to him and looked at him, again, I guess I would have to respectfully disagree with the Tenth Circuit interpretation. I think that no reasonable juror would find that in and of itself, and that is all he had, is sufficient to vitiate the probable cause that Rodney Porter has testified to that he had for the stop sign violations.

Aples' App. vol. III, at 516.

"'protect[ ] the Seventh Amendment right to trial by jury, and ensur[e] that the opposing party has enough notice of the alleged error to permit an attempt to cure it before resting.'" *Id.* (quoting *FSLIC v. Reeves*, 816 F.2d 130, 138 (4th Cir. 1987)). Mr. Marshall does not mention this issue in his response brief before us, although at oral argument, counsel reminded the panel that qualified immunity was not raised until after the jury reached its verdict. Mr. Marshall's failure to challenge the Rule 50(b) motion in his brief specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion results in a waiver of the issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (stating that failure to raise an issue in appellate brief waives the issue). We thus proceed to qualified immunity issue.

2. Review of Rule 50(b) post-verdict motion.

We next consider what impact the officers' Rule 50(b) motion has upon our standard of review. Where, as here, defendants "assert qualified immunity *after* undergoing trial on a § 1983 claim, a post-trial grant of immunity would still confer a benefit by shielding them from any liability for the monetary damages awarded by the jury." *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 562 n.6 (1st Cir. 2003) (emphasis added). We note that this two-stage "order of procedure is designed to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

Moreover, whether an asserted federal right was clearly established at a particular time such that a public official who allegedly violated the right has no qualified immunity from suit is a mixed question of law and fact we review de novo. *See Mitchell*, 472 U.S. at 528; *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001). Because the defendants appeal from a denial of qualified immunity motion raised *after* the jury's verdict, the evidence is "construed in the light most hospitable to the party that prevailed at trial." *Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999). That is, we consider whether the evidence is "so one-sided that defendants were entitled to prevail as a matter of law" on the constitutional claim. *Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002). In this procedural posture, "deference should be accorded the jury's discernible resolution of disputed factual issues." *Id.*

When evaluating a claim of qualified immunity, we "must first determine whether the plaintiff has alleged the deprivation of a constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson* , 526 U.S. at 609 (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law that unlawfulness must be apparent.

10

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations and internal quotation marks omitted).

"In discussing the degree of factual similarity that is required to conclude that the law is clearly established, the [Supreme] Court [has] noted that all that is required is that prior case law provide 'fair warning' that an officer's conduct would violate constitutional rights. Thus, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Denver Justice & Peace Comm., Inc. v. City of Golden*, 405 F.3d 923, 932 (10th Cir. 2005) (quoting *Hope*, 536 U.S. at 739-41) (citations omitted).

B. Deprivation of an actual constitutional right

In evaluating a qualified immunity defense, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). We need not linger on this threshold question because the defendants do not dispute that they "violated [Mr. Marshall's] [F]ourth [A]mendment rights by forcing him against his will to produce a blood sample." Aplts' App. vol. I, at 166 (Dist. Ct. Order, filed May 12, 2005); Reply Br. at 2.

C. The constitutional right was clearly established

Since the jury found a violation of Mr. Marshall's Fourth Amendment right to be free from unreasonable searches, we next consider whether the right was clearly established at the time of the incident. First, the officers take exception to

11

the district court's conclusion that it was clearly established that a nonconsensual warrantless blood test for a misdemeanor offense, conducted upon probable cause but in violation of state law, fell outside the exigent circumstances exception recognized in the Supreme Court's decision in *Schmerber v. California*, 384 U.S. 757 (1966). Specifically, they contend that when this case arose, (a) the law was unsettled as to whether violation of a state law barring nonconsensual blood testing would also amount to a violation of the Fourth Amendment; and (b) the law did not clearly indicate that classification of a driving under the influence ("DUI") offense as a misdemeanor would preclude a finding of exigent circumstances to sustain a warrantless blood test.

1. Exigent circumstances under *Schmerber v. California*

Indeed, as the Supreme Court has noted, it is clearly established that blood tests constitute searches under the Fourth Amendment. *Schmerber*, 384 U.S. 757, 767-68 (1966); *Marshall I*, 345 F.3d at 1171-72; *Anthony v. City of N.Y.*, 339 F.3d 129, 142 (2d Cir. 2003) (citing *Schmerber*); *Ellis v. City of San Diego*, 176 F.3d 1183, 1191 (9th Cir. 1999) (citing *Schmerber*). In *Schmerber*, the Court emphasized that the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusions by the State." 384 U.S. at 767. Similarly, "warrantless compulsory blood tests are unreasonable unless supported by both [1] probable cause *and* [2] exigent circumstances." *Ellis*, 176 F.3d at 1192 (requiring a search warrant "absent an emergency") (citing

12

*Schmerber*, 384 U.S. at 768-70) (emphasis added); *Marshall I*, 345 F.3d at 1171-72.  Because probable cause is not in question, our focus is on the latter factor, the requirement of an emergency, or exigent circumstance.

In *Schmerber*, the police arrested the defendant for driving under the influence of alcohol.  384 U.S. at 758.  "Although ultimately prosecuted for a misdemeanor, he was subject to prosecution for a felony because of the injury to the passenger."  *Marshall I*, 345 F.3d at 1172.  There was no question the police had probable cause to arrest Mr. Schmerber.  *Schmerber*, 384 U.S. at 758-59.  Mr. Schmerber refused the police request to submit to a breathalyzer test.  *Id*. at 765 n.9.  Thus, the police had only one way to obtain the necessary evidence, a blood test.  The police then compelled the defendant, over his objections and without a warrant, to provide blood samples to determine the percentage of alcohol in his blood.  *Id.* at 759.

The Court noted that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system."  *Id*. at 770.  Because the percentage of alcohol in a person's blood is evanescent, the Court noted that under the "special facts" of the case, "there was no time to seek out a magistrate and secure a warrant" before the blood alcohol level had diminished.  *Schmerber*, 384 U.S. at 770-71; *Marshall I*, 345 F.3d at 1172.  Because the "delay necessary to obtain a warrant . . . threatened the destruction of the evidence," the Court upheld the warrantless seizure of blood.

13

*Schmerber*, 384 U.S. at 770.

Further, in delineating the "special facts" or exceptions to the warrant requirement, we have pointed out that the Supreme Court

> reach[ed] this judgment only on the facts of [that specific] record. *The integrity of an individual's person is a cherished value of our society.* That we today [h]old that the Constitution does not forbid the States minor *intrusions into an individual's body under stringently limited* conditions in no way indicates that it permits . . . intrusions under other conditions.

*Marshall I*, 345 F.3d at 1173 (quoting *Schmerber*, 384 U.S. at 772) (emphasis added); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) ("In light of our society's concern for the security of one's person, . . . it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of . . . privacy interests.") (citations omitted); *California v. Acevedo*, 500 U.S. 565 (1991) (stating that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions'") (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).

The officers argue that a reasonable officer in 1996 could have reasonably understood that a warrantless blood test performed under the exigent

14

circumstances as described in *Schmerber* would not violate the Fourth Amendment, even if the blood test was conducted in violation of state law. At the time of the officers' conduct, however, it was well-settled that "the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." *Cupp v. Murphy*, 412 U.S. 291, 295 (1973). Thus, with respect to the exigency exception, the Court had recognized the "exigency exception permits warrantless searches only to the extent that exigency exists." *Skinner*, 489 U.S. at 643 (citing *Chimel v. California*, 395 U.S. 752, 761-64 (1969)).

The exigent circumstances that justified the state's bodily intrusion in *Schmerber* are not present in the instant case. Unlike the defendant in *Schmerber* who refused a breathalyzer test, Mr. Marshall submitted to *two* breathalyzer tests. The results of each were negative. The results from the breathalyzer tests and a blood test are of "similar evidentiary value," and the officers do not argue otherwise. *Nelson v. City of Irvine*, 143 F.3d 1196, 1207 (9th Cir. 1998). When a suspect has taken an "alternative test of equal evidentiary value, the risk that evidence will be lost disappears and the exigent circumstance that excused the police from obtaining a warrant likewise disappears, rendering a warrantless nonconsensual blood test in such circumstances unconstitutional." *Id.* The fact that Mr. Marshall had already passed two breathalyzer tests makes the officers' decision to perform a warrantless nonconsensual blood test all the more

15

unreasonable.

In sum, we agree with the district court that the officers had fair warning of exigent circumstances requirement under federal law. Aplts' App. vol. I, at 166-67 (Dist. Ct. Order, filed May 12, 2005) ("[I]t should have been clear to these officers that their conduct was unlawful in this case.").

### a. New Mexico's implied consent law

As *Marshall I* concluded, it is appropriate to look to state law to determine the reasonableness of a search for Fourth Amendment purposes. 345 F.3d at 1173 (characterizing Mr. Marshall's argument as contending that "state law does not authorize New Mexico police to compel a blood test in a misdemeanor case involving no physical injury . . . ."); *see Tenn. v. Garner*, 471 U.S. 1, 15-16 (1985) ("In evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to prevailing rules in individual jurisdictions."); *United States v. Richardson*, 86 F.3d 1537, 1544 (10th Cir. 1996) (stating that federal courts are to "conduct an independent inquiry . . . apply[ing] federal law" into the reasonableness of a search, and noting that federal courts "are not prohibited from considering state law") (citation omitted). In *State v. Richerson*, 535 P.2d 644, 648 (N.M. Ct. App. 1975), the New Mexico Court of Appeals, citing *Schmerber*, held that exigent circumstances must be present for a warrantless blood test to fall within the Fourth Amendment's parameters:

the warrantless search of the defendant was justified because, (a) it was

16

made incident to a lawful arrest, (b) plaintiff smelled of liquor, *and* (c) the police officer *was confronted with an emergency* due to the progressive diminution of the blood alcohol level during the time interval incident necessary to obtain a search warrant.

*Id.* (emphasis added). Assuming the presence of factors (a) and (b), lawful arrest and that Mr. Marshall had alcohol on his breath, we hold the officers are unable to establish the presence of an emergency.

The officers argue that New Mexico law was far from clear as to whether or not a search or seizure conducted in violation of state law would also infringe the Fourth Amendment. New Mexico's statutes are uniquely clear about the right at issue. Pursuant to N.M. Stat. Ann. § 66-8-105 *et seq.* (Michie 1998) ("New Mexico Implied Consent Act"),

> If a person under arrest for violation of an offense enumerated in the Motor Vehicle Code . . . refuses upon request of a law enforcement officer to submit to chemical tests designated by the law enforcement agency as provided in section 66-8-107 NMSA 1978, none shall be administered *except when a municipal judge, magistrate or district judge issues a search warrant authorizing chemical tests* as provided in section 66-8-107 NMSA 1978 upon his finding in a law enforcement officer's written affidavit that there is probable cause to believe that the person has driven a motor vehicle while under the influence of alcohol or a controlled substance, thereby causing the death or great bodily injury of another person, *or there is probable cause to believe that the person has committed a felony* while under the influence of alcohol or a controlled substance *and that chemical tests as provided in section 66-8-107 NMSA 1978 will produce material evidence in a felony prosecution.*[3]

---

[3] As we noted in *Marshall I*, "[s]ince Mr. Marshall's arrest, the statute has been slightly modified. The changes, however, have no bearing on the issue raised by this case. *See* N.M. STAT. ANN. § 66-8-111(A) (Michie, LEXIS through

(continued...)

17

*Id.* § 66-8-111(A) (emphasis added). As we pointed out in *Marshall I*:

> The statute describes two scenarios under which a magistrate can issue a warrant for chemical tests, including a blood test: (i) upon probable cause to believe that a person has driven while under the influence of alcohol or a controlled substance and has thereby caused the death or great bodily injury of another person; and (ii) *upon probable cause to believe that the person has committed a felony* while under the influence of alcohol or a controlled substance and that chemical tests will produce material evidence in a felony prosecution. Under New Mexico law, the driver's license of a person arrested for driving under the influence may be revoked if he refuses to submit to a chemical test. *. . . But if the subject refuses to submit to the test, the statute expressly forbids the police from administering it without a warrant.*

345 F.3d at 1173-74 (emphasis added).

The officers contend that, despite the New Mexico Implied Consent Act's admonitions, New Mexico law was unclear as to whether the warrantless seizure of blood could violate a defendant's *constitutional* rights. They cite *State v. Steele* for the proposition that "compulsory blood tests do not violate constitutional rights." Aplts' Br. at 26 (quoting *State v. Steele*, 601 P.2d 440, 441 (N.M. Ct. App. 1979) (citing *Schmerber,* 384 U.S. 757 (1966)). *Steele* involved an arrestee suspected of committing vehicular homicide, a felony. Importantly, *Steele* involved the admission of the results of a blood test into evidence, implicating Fifth Amendment self-incrimination concerns. *Schmerber* held that the compulsory administration of a blood test and admission into evidence the

_____

[3](...continued)
2003 Sess.).

18

test's results does not implicate the Fifth Amendment, 384 U.S. at 761, "it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." *Id.* at 767. Thus the New Mexico Court of Appeals, despite there being no Fifth Amendment prohibition against the use of the chemical analysis, was constrained by the New Mexico Implied Consent Act, noting that "consent of the offending driver *must be* obtained before blood test results may be introduced in a trial charging a criminal act resulting from driving while intoxicated." 601 P.2d at 441 (emphasis added). The sole exception to this consent requirement is a warrant supported by probable cause. *Id.*

No such warrant was issued in the instant case. Moreover, pursuant to the New Mexico Implied Consent Act, "no search warrant could lawfully have been obtained to compel a test of Mr. Marshall's blood" because Mr. Marshall was not suspected of having committed a felony. *Marshall I*, 345 F.3d at 1174; *see* New Mexico Implied Consent Act § 66-8-111(A) (requiring "probable cause to believe that the person has committed a *felony*" before issuance of a warrant).

The officers also cite to *State v. Wyrostek*, 767 P.2d 379 (N.M. Ct. App. 1988). *Wyrostek* stated that "[b]ecause [the officer] had probable cause to believe Wyrostek was under the influence of intoxicating liquor, and because of the evanescent nature of blood-alcohol levels, the trial court found that exigent circumstances justified the warrantless seizure of blood. Thus, no constitutional issues are raised by this case." *Id.* at 380.

19

*Wyrostek* involved a very different set of facts. The *Wyrostek* inquiry considered whether the New Mexico Implied Consent Act required an officer to arrest an unconscious driver before administering a blood test. Because the defendant's freedom of action was already restricted as he was unconscious, the court determined that an arrest would have been a "useless act." *Id.* at 381. Unlike Mr. Marshall, the driver in *Wyrostek* was incapable undergoing the less-intrusive breathalyzer test. Reasoning that defendant's unconscious state did not withdraw his consent under the New Mexico Implied Consent Act[4] the court concluded that the officers were justified in the taking of the blood test. *Id.*

No one disputes that Mr. Marshall's refusal to submit to a blood test put him in violation of New Mexico's implied consent law and that his driver's license could be suspended as a result. As we discussed with regard to *Schmerber*, where, as here, police could and did use an alternative, less intrusive, means of testing blood-alcohol content, a blood test is not necessary and cannot be justified by exigent circumstances. The officers needed something more to justify a blood test after Mr. Marshall's voluntary submission to two breathalyzer

_____

[4] The New Mexico's Implied Consent Act states in pertinent part:

Any person who is dead, unconscious or otherwise in a condition rendering him incapable of refusal, shall be deemed not to have withdrawn the consent provided by Section 66-8-107 NMSA 1978, and the test or tests designated by the law enforcement officer may be administered.

§ 66-8-108.

20

tests. *See Richerson*, 535 P.2d at 648 (requiring that the officer be "confronted with an emergency"); *Hammer v. Gross*, 932 F.2d 842, 854 (9th Cir. 1991) ("If the government is going to use force to pin someone to a chair, stick a needle in his arm and drain blood from his vein, against his will and despite his acquiescence in an effective alternative [here, a breathalyzer test] it had better have a reason.") (Kozinski, J., concurring in part and dissenting in part).

                b. The effect of New Mexico's classification of a DUI
                offense as a misdemeanor

Next, the officers contend that the law was not clearly established that New Mexico's classification of a DUI offense as a misdemeanor would preclude a finding of exigent circumstances to sustain a warrantless blood test. In their attempt to reframe the dispositive question, the officers maintain that our opinion in *Marshall I* misconstrued *Welsh v. Wisconsin*, 466 U.S. 740 (1984). According to the officers, *Welsh* "did not indicate – let alone establish – how, if at all, its rationale should be extended beyond home entries into the area of blood testing." Aplts' Br. at 34.

As we summarized *Welsh* in *Marshall I*,

> the defendant's car swerved off the road, coming to a stop in an open field. A witness, noticing the car driving erratically, contacted the police, but by the time they arrived defendant Welsh had walked away from the scene. By checking the vehicle identification number, police were able to identify the car as belonging to Welsh, and proceeded to his home without first obtaining a warrant. Police entered his home and took him to the station house to administer a breathalyzer test. Welsh refused to take the test and as a result was charged and convicted in two

21

separate, but related, proceedings: one concerning his refusal to submit to a breathalyzer test and the second relating to driving while intoxicated. The Wisconsin Supreme Court upheld the convictions, ruling that the warrantless arrest was justified under the doctrine of exigent circumstances.

The Supreme Court reversed both convictions. Although the government argued that the need to preserve the evidence of Welsh's blood alcohol level created exigent circumstances, the Court held that *preservation of evidence did not justify a warrantless in-home arrest* if the offense for which probable cause was said to exist is "*relatively minor.*"

345 F.3d at 1175 (internal citations omitted) (emphasis added).

The officers misread *Welsh*. A person's home is his or her castle, and throughout history, one of the key purposes of a castle's walls has been to protect the castle-owner's blood. As the *Welsh* Court explained:

[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized *only a few such emergency conditions*, *see, e.g.*, *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298-299 (1967) (same); *Schmerber*, 384 U.S. 757, 770-771 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (ongoing fire).

*Welsh*, 466 U.S. at 749-50.

As to finding those exigent circumstances, the Court expressed its hesitation, "especially when warrantless arrests in the home are at issue" and when "the underlying offense for which there is probable cause to arrest is relatively minor." *Id.* at 750. Moreover, the Court expressly stated in *Schmerber* that non-emergency invasions of the body are due *at least* the same protections as

22

are warrantless searches in the home. *Schmerber*, 384 U.S. at 770 ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions of the human body are concerned.").

*Welsh*'s impact upon the present case is abundantly clear: "[T]he offense that "[Mr.] Welch was suspected to have committed was 'a noncriminal civil forfeiture offense, for which no imprisonment is possible . . . . Given this expression of the States' interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood alcohol level might have dissipated while police obtained a warrant.'" *Marshall I*, 345 F.3d at 1175 (quoting *Welsh*, 466 U.S. at 754). Thus, a state law's characterization of the gravity of the offense is particularly relevant when analyzing Fourth Amendment violations. *See Marshall I*, 345 F.3d at 1176 (citing *Howard v. Dickerson,* 34 F.3d 978, 982 (10th Cir. 1994) and *United States v. Flowers*, 336 F.3d 1222, 1229-31 (10th Cir. 2003)).

Here, Mr. Marshall was suspected of having committed a misdemeanor. As the *Marshall I* panel stated, New Mexico has a "limited interest in coerced testing of the blood of a motorist charged with a petty misdemeanor." 345 F.3d at 1176. Moreover, the statute does not even allow a magistrate the authority to issue a warrant for such a search. *See id.*; N.M. STAT. ANN. § 66-8-111(A) (requiring "probable cause to believe that the person has committed a *felony*" before

23

issuance of a warrant) (emphasis supplied). Because there was no possibility of obtaining a warrant, it was readily clear that the exigent circumstances exception to *Schmerber* could not exist. *Marshall*, 345 F.3d at 1176. Accordingly, we reject the officers' contention that they did not have "fair warning" that, at the time of the events in question, New Mexico's classification of a DUI offense as a misdemeanor would preclude the finding of exigent circumstances under *Schmerber. Hope*, 536 U.S. at 740.

The jury found that Mr. Marshall's actions in no way amounted to consent. As the district court concluded, it is difficult to imagine how a competent officer could think it could make sense or be reasonable to violate state law. Aplts' App. vol. I, at 167 ("I conclude that even if these officers mistakenly thought what they did was proper, it was objectively unreasonable for them to think they could lawfully give this blood test in the absence of Mr. Marshall's consent. . . ."); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (stating that "a reasonably competent public official should know the law governing his conduct"). Viewing the facts in the light most favorable to the jury's verdict, the district court correctly concluded that a reasonable officer, similarly situated, would understand that his or her conduct violated the rights clearly established in *Schmerber*.

24

## III. CONCLUSION

Accordingly, we AFFIRM the district court's denial of the officers' post-verdict motion for judgment as a matter of law.