*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMY LYNN FORD,

        *Plaintiff-Appellee*,

        *v*.

COUNTY OF GRAND TRAVERSE,

        *Defendant-Appellant*.

No. 07-1062

>

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00682—Marianne O. Battani, District Judge.

Argued: April 25, 2008

Decided and Filed: August 5, 2008

Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellant. Frederick E. Mackraz, KUIPER ORLEBEKE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for Appellant. Frederick E. Mackraz, KUIPER ORLEBEKE, Grand Rapids, Michigan, for Appellee.

    GILMAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. ROGERS, J. (p. 15), delivered a separate dissenting opinion.

---

**OPINION**

---

    RONALD LEE GILMAN, Circuit Judge. On a Sunday morning in January of 2003, Amy Lynn Ford, a self-described recovering alcoholic who also suffers from epilepsy, was arrested on a probation violation and taken to the Grand Traverse County Jail in Traverse City, Michigan. That afternoon, Ford had a seizure, fell from the top bunk of a bed in her cell, and sustained significant injuries to her right hip and right clavicle. Ford subsequently brought suit against a number of jail officials and the County of Grand Traverse (collectively referred to as the defendants). She claimed that the officials had exhibited deliberate indifference to her serious medical needs in violation of her constitutional rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

Ford also contended that the County's policy or custom regarding the provision of medical care at the jail on weekends reflected deliberate indifference to her serious medical needs and had caused her injuries.

Her case proceeded to trial. The jury found that none of the jail officials were deliberately indifferent to Ford's serious medical needs, but determined that the County's policy regarding weekend medical care exhibited deliberate indifference to and was the proximate cause of Ford's injuries. It awarded her $214,000 in damages. After the verdict was returned, the County brought two motions for judgment as a matter of law. The district court denied both motions. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

On the morning of Sunday, January 12, 2003, Ford was arrested for violating the terms of her probation for a prior offense and was transported to the Grand Traverse County Jail. Ford had been prescribed an anti-seizure medication, Dilantin, to control her epilepsy, and had been advised by her physician not to drink alcohol while taking the drug. Because she had been drinking on January 11 and January 12, Ford acknowledged that she had not taken her Dilantin on the morning of her arrest. The defendants, moreover, introduced proof (based on Ford's lack of memory, her physician's testimony, and pharmacy records) that she had not taken Dilantin since at least the preceding week.

Two nurses and a doctor are employed by the County to provide medical care for the inmates at the jail. One of the nurses is on duty full time during regular business hours on weekdays, and the part-time nurse is on duty 20 hours per week but makes her own schedule. The part-time nurse is not required to be present at the jail on weekends or to notify the jail officials whether or not she will be at the jail on any particular day. One of the nurses, however, is either on-site or on-call at all times.

The County's written policy states that if a new inmate "claim[s] a need for regular medications, a member of the medical staff must be contacted for approval." Jail officials are trained to contact medical personnel when a new inmate claims a need for medication, and the doctor and both nurses are authorized to consider and approve such a request.

During Ford's intake booking, Deputy Sheriff Luke Lansbach asked Ford about her medical needs and completed a Medical Screening Questionnaire. He noted on the form that Ford had epilepsy, that she took Dilantin, and that on that day she had not taken her medication. Lansbach testified that he placed the form in the nurse's inbox, but that he did not contact the nurse on-call or the doctor because Ford had not expressed an urgent need for the Dilantin and because he believed that one of the nurses was coming to the jail that day. Neither nurse, however, came to the jail on that Sunday.

County Sheriff Robert J. Hall, the jail administrator, testified at trial that although he was not the author of the County's written jail policy, he had the authority to develop and change the policy as necessary. Hall further stated that, in his opinion, Lansbach's decision to put Ford's Medical Screening Questionnaire into the nurse's inbox (as opposed to promptly calling the on-call nurse) did not constitute a violation of the County's written policy requiring that a member of the medical staff "be contacted" when an inmate claims a need for medication.

Deputy Sheriff Sophia DeLonghi helped Ford change from street clothes into jail attire and escorted Ford to her cell. Ford told DeLonghi that she was an epileptic and that she had not taken her medication. DeLonghi testified that on the way to Ford's cell, DeLonghi stopped and told the

supervisor on duty, Sergeant Robert Smith, that Ford had not taken her medication that morning. When Ford and DeLonghi arrived at the cell, Ford again informed DeLonghi that she had not taken her seizure medication and also said that she needed a bottom bunk.

A bottom bunk was not available at that time. DeLonghi testified that she ordered another inmate to move and told Ford to take the newly available bottom bunk. Ford and one of her cellmates, however, did not recall DeLonghi making such an order. To the contrary, Ford testified that an inmate had offered her a bottom bunk, but that she said "[n]o, I'm fine," and proceeded to go to sleep in the top bunk.

Deputy DeLonghi also said that when she left Ford's cell, she told Sergeant Smith and Deputy Michael Johnson that Ford had "again asked for her meds" and that both men indicated that they were aware of Ford's medical situation. But Smith and Johnson both denied any recollection of such a conversation. None of the jail officials in fact called the on-call nurse or took other steps to procure Dilantin for Ford. Later that afternoon, Ford suffered a seizure and fell from the top bunk, severely injuring her right hip and right clavicle.

Dr. David Wilcox, the jail's physician, was the only expert to testify as to whether administering Dilantin to Ford on the morning of January 12, 2003, would have prevented her seizure that afternoon. The content and significance of his testimony have therefore been a source of much disagreement both at trial and now on appeal. Ford's attorney asked Dr. Wilcox on direct examination: "If someone came in with absolutely no Dilantin in their blood system and you gave them two caplets, would you not agree with me that in one to four hours they would have enough to inhibit seizures?" Dr. Wilcox responded by saying that "[t]hey would have enough to *start* inhibiting seizures . . . ." (Emphasis added.)

At that point, Ford's attorney confronted Dr. Wilcox with his prior deposition testimony:

> "[Question by Ford's attorney at Dr. Wilcox's deposition:] How long generally does it take for Dilantin to become effective to do its job and numb the brain?
>
> Answer: If a patient doesn't have any Dilantin in their bloodstream it can take one to four hours to get it high enough.
>
> . . . .
>
> Question: And after Dilantin circulates through the body one to four hours, I take it there's enough in the blood system to inhibit these seizures, correct?
>
> Answer: There should be, yes.
>
> . . . .
>
> Question: So it's safe for me to assume that two pills for Amy Ford is effective for 12 hours?
>
> Answer: Yes.
>
> Question: And assuming there's no Dilantin in her system, it would take one to four hours to actually become effective."

Rather than reading the answer that Dr. Wilcox had given to the last question, Ford's attorney asked Dr. Wilcox a follow-up question: "And your answer [to the last quoted question] was yes, is that right?" Dr. Wilcox responded by saying: "My answer was yes and that was an error."

On cross-examination by the County, Dr. Wilcox testified that if a person with epilepsy had not had Dilantin in their system for "several days," the one-to-four-hour window that he had discussed might not be sufficient to inhibit seizures. Dr. Wilcox also stated that, given the low level of Dilantin in Ford's blood at the hospital after the seizure, he could not say "to a reasonable degree of medical certainty" that giving Ford Dilantin in the morning would have prevented her seizure that afternoon.

## B.      Procedural background

Ford brought suit against DeLonghi, Johnson, Lansbach, Smith, and the County. She claimed, pursuant to 42 U.S.C. § 1983, that the jail officials had violated her Eighth and Fourteenth Amendment rights to medical treatment by failing to ensure that she was given Dilantin or to otherwise protect her from injuries due to her epilepsy. Ford further alleged that the County's policy and custom regarding the provision of weekend medical care at the jail had caused her injuries.

The case went to trial in May of 2006. At the close of the second day of trial, before Ford had rested her case but after all of her evidence had been proffered, the attorney for the defendants moved for a directed verdict pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. (In 1991, Rule 50 was amended to substitute the uniform term "judgment as a matter of law" in place of "judgment notwithstanding the verdict" and "directed verdict." Both the district court and the parties, however, have consistently employed the outdated term "directed verdict." We will therefore do the same for the sake of convenience and clarity.)

The defendants' attorney asserted that Ford had "fail[ed] to make out a prima facie case against the county" on a theory of deliberate indifference. In particular, he contended that Ford had not shown (1) a causal link between the County's policy and the alleged constitutional deprivation, or (2) a pattern of misconduct of which the County was aware. He also argued that each of the individual jail officials was entitled to qualified immunity and that, in any case, Ford had failed to establish that any of the officials "possessed a sufficiently culpable state of mind" under the deliberate-indifference standard. The district court denied the motion, concluding that "there is enough in plaintiff's case to allow this to go to the jury."

At the close of Ford's case, the defendants' attorney again moved for a directed verdict on the basis that Ford had failed to show that receiving Dilantin would have prevented her seizure, or that a seizure had been the cause of her fall. The district court denied this motion as well, reasoning that Dr. Wilcox's deposition testimony and the testimony of inmates who had observed Ford's fall was sufficient to permit a jury to find for Ford on the causation issues raised.

At the close of all the evidence, the attorney for the defendants did not renew his motion for a directed verdict. The case instead proceeded with closing arguments and jury instructions, with the jury being given a verdict form that the defendants' attorney had proposed and upon which the attorneys for the parties had agreed. That form asked a series of 12 questions. The first question read: "Was Grand Traverse County deliberately indifferent to the medical needs of the Plaintiff through its policy or custom regarding weekend medical care?" If the jury answered that question affirmatively, it was instructed to determine whether "the subject policy or custom [was] a proximate cause [of] the Plaintiff's injury." Subsequent questions addressed whether each of the individual jail officials had been deliberately indifferent to Ford's medical needs and, if so, whether that official's actions were a proximate cause of her injuries. Finally, the jury was directed to assess

actual and punitive damages, but only if it had answered "[y]es" to any of the above sets of questions relating to deliberate indifference and causation.

The jury found that although none of the individual jail officials had been deliberately indifferent to Ford's medical needs, the County's policy exhibited deliberate indifference and was a proximate cause of her injuries. Ford was then awarded $214,000 in compensatory damages by the jury. After the verdict was read in the courtroom, the district court instructed Ford to "submit a judgment consistent with the jury verdict."

The County then intervened by filing two motions for judgment as a matter of law. It claimed that (1) there was no evidence to support the jury's finding that the County's policy had caused Ford's injury, and (2) the County could not be held liable in the absence of a finding that one of its jail officials had violated Ford's constitutional rights.

The district court denied both motions. With respect to the causation issue, the court concluded that Dr. Wilcox's deposition testimony was sufficient to support the jury's finding that Ford's seizure would have been prevented if a nurse had been promptly contacted that day. The court also rejected the contention that liability could not attach to the County in the absence of a finding that any of the individual jail officials had committed a constitutional violation. In particular, the court noted that municipal liability could be premised either on (1) the actions of unnamed parties, or (2) "the acts of several employees acting pursuant to a government policy or custom even where no individual action violates a plaintiff's constitutional rights." The court explained that its denial of the County's motion "rest[ed] on these possibilities" because the County had failed to specifically raise this legal theory in its motion for a directed verdict. Furthermore, the court noted that the County had submitted the special-verdict form, which "allowed for a verdict against the County, regardless of the findings made as to the individual defendants." This timely appeal followed.

## II. ANALYSIS

### A.    Scope of the issues reviewable on appeal

The County has raised two issues on appeal. First, it contends that the district court erred in denying its motion for judgment as a matter of law, which motion was based on the theory that the County cannot be held liable under 42 U.S.C. § 1983 in the absence of a constitutional violation by any of the individual jail officials. Second, it claims that there was insufficient evidence to establish a causal link between the County's policy or custom and Ford's injuries.

Ford, in turn, argues that the issues raised by the County in this appeal are not properly before us. First, she claims that the County waived its right to bring either of its post-trial motions for judgment as a matter of law by failing to renew its motion for a directed verdict at the close of all the evidence. She also contends that the County waived its argument that municipal liability is improper as a matter of law by (1) failing to specifically raise the claim in its motion for a directed verdict, and (2) submitting the special-verdict form that allowed for a finding of County liability irrespective of the liability of the individual jail officials, thus "inviting" the alleged error about which the County now complains.

"The question of waiver is a mixed question of law and fact. We review any determination of underlying facts under the clearly erroneous standard of review, and make a de novo determination of whether those facts constitute legal waiver." *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004) (internal quotation marks omitted).

### 1.     The County's failure to renew its Rule 50(a) motion at the close of all the evidence

The 2006 Amendment to Rule 50 of the Federal Rules of Civil Procedure dispensed with the requirement that a party must renew its Rule 50(a) motion at the close of all the evidence in order to preserve the ability to bring a post-verdict motion for judgment as a matter of law. But those amendments were not in effect at the time of trial in Ford's case. Thus, as a technical matter, the County was still required to renew its motion after the close of all the evidence. *See A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 447 (6th Cir. 2005) ("[A] court can . . . consider a motion for a judgment notwithstanding the verdict *only if* the moving party has previously made a motion for a directed verdict at the close of all the evidence." (emphasis in original) (internal quotation marks omitted)).

The district court in the present case, however, did not rest its denial of the County's post-verdict motions on this ground. To the contrary, the court's orders (filed on December 4 and December 11, 2006) quote the amended language of Rule 50(b) and explicitly state that "a post-trial motion for judgment as a matter of law. . . . can only be made as a renewal of a motion made *before the case was submitted to the jury*." (Citing Fed. R. Civ. P. 50(a)&(b)) (Emphasis added.) A review of Ford's responses to the County's post-verdict motions, moreover, shows that Ford did not raise this particular waiver argument in the district court. Ford's contention on this point, therefore, is itself subject to waiver. *See United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 758 (6th Cir.1999) ("Because the issue was not raised in the district court below, Appellants have waived their right to argue the point on appeal."); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2007) (concluding that the plaintiff had waived the ability to challenge the adequacy of the defendant's Rule 50(a) motion by failing to raise the issue until oral argument on appeal). For these reasons, we will excuse the County's failure to renew its motion at the close of all the evidence.

### 2.     The County waived its argument that the exoneration of individual jail officials bars a finding of municipal liability

Ford's next two arguments regarding the appropriate scope of this appeal relate to the County's claim that it was entitled to judgment as a matter of law because the jury found that no individual jail official had acted with deliberate indifference to Ford's serious medical needs. We will consider each argument in turn.

### a.     Submission of the verdict form

Ford relies on *Harvis v. Roadway Express Inc.*, 923 F.2d 59 (6th Cir. 1991), to support her contention that because the County proposed the special-verdict form that allowed for a finding of municipal liability in the absence of individual liability, "any claimed error after the fact was invited" by the County. In *Harvis*, this court explained that

> [t]he doctrine of "invited error" is a branch of the doctrine of waiver by which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside. . . . Having induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error.

*Id.* at 61.

The County responds by arguing that the invited-error doctrine is inapplicable because the form used in the present case did not constitute an error in and of itself. Rather, the County contends that it was a perfectly acceptable special-verdict form, but that "[a]fter a finding by the jury that the individual officers' conduct did not amount to deliberate indifference, the court should have determined as a matter of law that the county was not liable." The error, according to the County, was not in the jury's factual findings, but in the district court's failure to enter judgment for the County as a matter of law based on those findings.

We agree with Ford that—in light of the County's current position (i.e., that municipal liability must always be premised on a constitutional violation by an individual official)—the verdict form should not have been structured in a way that permitted the jury to make findings relating to the liability of the municipality before, and entirely independent of, the findings regarding the individual officials. But we decline to conclude that the County necessarily invited the error complained of as a result of this inartful drafting (and therefore waived its argument relating to the lack of individual liability) because, even if we were to accept Ford's argument, we would nevertheless be free to consider whether the judgment that resulted from the special-verdict form constituted a plain error. *See Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) (explaining that although "[s]ilence after instructions, including instructions on the form of the verdict to be returned by the jury, typically constitutes a waiver of any objections[,] . . . this court has made an exception to the principle of non-reviewability in cases of plain error" (internal quotation marks omitted)); *see also Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 251 (6th Cir. 1991) (explaining that because the doctrine of invited error "is a branch of the doctrine of waiver," appellate courts have discretion to deviate from the rule when "application of the rule would result in a manifest injustice"). In any event, our disposition of Ford's second waiver argument (discussed below) renders a resolution of this invited-error claim unnecessary.

### b. The County failed to present its legal theory in its Rule 50(a) motion

Ford's alternative contention is that the County failed to preserve its argument that municipal liability must be premised on an individual employee's liability by failing to specifically raise the argument in its Rule 50(a) motion. Her argument is based on the well-established proposition that a post-trial motion for judgment as a matter of law "is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury." *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997); *see also* Fed. R. Civ. P. 50(b) (permitting a party to "renew" an earlier "request for judgment as a matter of law"). The Advisory Committee Note to the 2006 Amendment to Rule 50 reiterates this requirement and explains the reasons for it:

> Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion. The earlier motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available. The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.

Limiting the availability of a post-trial judgment as a matter of law also ensures that the plaintiff's Seventh Amendment right to a jury trial is adequately protected by "requiring that parties raise important issues *before* the case is submitted to the jury." *Am. & Foreign Ins. Co.*, 106 F.3d at 160 (emphasis in original); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739 (10th Cir. 2007) (noting that one of the purposes of Rule 50 is to "protect the Seventh Amendment right to trial by jury" (alteration and internal quotation marks omitted)); *Libbey-Owens-Ford Co. v.*

*Ins. Co. of N. Am.*, 9 F.3d 422, 426 (6th Cir. 1993) (explaining that a party failing to timely file a motion for a directed verdict is foreclosed from bringing a post-trial motion because "[i]t is too late to complain of the submission of an issue to the jury after a litigant has taken a chance on what the jury will do and after the jury has resolved the issue against him" (internal quotation marks omitted)).

Relying on these legal authorities, Ford argues that the County should be barred from claiming that municipal liability cannot attach because at no point before the case was submitted to the jury did the County ever argue that its own liability was contingent on a constitutional violation by an individual jail official. The County responds by contending that its motion for a directed verdict was specific enough to preserve the objection raised in its post-trial motion for judgment as a matter of law. On this score the County relies on this court's decision in *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006), where the court acknowledged that although "[a] post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion," a party is not required to state the grounds for judgment with "technical precision."

In *Kusens*, the employer made an oral motion for judgment as a matter of law at the close of all the proof, arguing that the employee's wrongful-discharge claim should be dismissed because the employee had failed to argue or even reference the claim during the trial. *Id.* at 354. The district court denied the motion, but subsequently granted the employer's post-trial motion in which the employer argued more specifically that the employee's wrongful-discharge claim under Ohio law must fail because he had failed to plead or prove one of the necessary elements of the claim (i.e., that he was an at-will employee). *Id.* at 354-55.

On appeal, this court rejected the employee's contention that the employer had failed to raise the issue of at-will employment in its pre-verdict motion. *Id.* at 362. The court called the issue a "close question," but explained that

> [a]lthough Rule 50(a) requires a motion for judgment as a matter of law to state the "specific grounds," the rule does not define how specific the grounds must be. Because the requirement that a Rule 50(a) motion must precede a Rule 50(b) motion is "harsh in any circumstance," a Rule 50(a) motion should not be reviewed narrowly but rather in light of the purpose of the rules to secure a just, speedy, and inexpensive determination of the case. Accordingly, where Rule 50(a)'s purpose—i.e., providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury—has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion.

*Id.* at 361 (citations omitted).

The *Kusens* court analogized the case before it to the ruling in *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995), where the Eighth Circuit concluded, in a tort action, that a defendant's generalized argument in a preverdict motion to exclude the use of a contractual breach to establish a duty of care was sufficient to preserve its argument in a post-trial motion that state law prohibited tort liability for purely economic losses. In both cases, reasoned the *Kusens* court, the post-verdict motions elaborated more specifically on "essential element[s]" of the claims that had been raised in the preverdict motions. *Kusens*, 448 F.3d at 362.

The County contends that the rationale of *Kusens* defeats Ford's waiver argument. According to the County, the argument that it cannot be held liable because there was no

constitutional violation by the individual jail officials is simply a more specific version of its general argument (made in its motion for a directed verdict) that there was insufficient evidence to establish deliberate indifference on behalf of the County. "[L]ike the Defendant in *Kusens*, Defendant in this case 'simply restate[d] the identical argument [raised in its pre-verdict motion] in more precise terms.'" (Quoting *Kusens*, 448 F.3d at 363 (alterations in original).)

We are not persuaded by the County's analogy. True enough, the County's insufficiency-of-the-evidence argument should have been adequate to "provid[e] notice to the court and opposing counsel of any deficiencies in [Ford's] case" with respect to the deliberate-indifference standard. But unlike *Kusens* and *Rockport*, where the issues discussed in the post-verdict motions related back to the same legal theory raised in the preverdict motions, the only similarity between the two motions in the present case was that, broadly speaking, both challenged the liability of the County. *See Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 821 (8th Cir. 2004) (concluding that the defendant had failed to preserve an argument related to a damages award flowing from a misappropriation-of-trade-secrets claim raised only in a Rule 50(b) motion because such a motion could not be used "as a vehicle to introduce a legal theory not distinctly articulated in its . . . motion for a directed verdict" (internal quotation marks omitted)). Were we to conclude that the County's preverdict motion in this case constitutes the requisite "specific grounds" for the issue raised in its post-verdict motion, that requirement would as a practical matter cease to provide any limitation at all.

Moreover, the trial transcript contains no mention of this legal argument whatsoever, despite the County's present contention that the legal theory advanced in its post-trial motion is "inextricably intertwined" with the sufficiency-of-the-evidence argument raised at trial. Not only did the County never engage in a colloquy with the district court or opposing counsel on this point, but it also never requested that the jury be instructed that municipal liability was dependent upon a finding that the individual jail officials committed a constitutional violation. *See Conseco Fin. Servicing Corp.*, 381 F.3d at 822 n.7 (concluding that the defendant had developed the legal theory raised in its Rule 50(b) motion only after the jury verdict "because it (1) failed to object to the general-verdict form, (2) offered no jury instructions explaining [the legal theory advanced in its post-verdict motion], and (3) made no substantive objection to the [relevant jury] instruction"). For these reasons, we conclude that the County has waived this argument and we therefore decline to address its merits.

## B.    Causation

### 1.    *Standard of review*

Our review is thus limited to the County's claim that the district court should have granted its motion for judgment as a matter of law on the basis that the evidence was insufficient to show a direct causal link between the County's policy or custom of providing limited weekend medical care and Ford's injuries. Ford, in turn, contends that the County is impermissibly attempting to raise new issues on appeal because "the only issue presented" to the district court in its post-verdict motion for judgment as a matter of law challenged the admission of Dr. Wilcox's deposition testimony as substantive evidence. She also argues that this was the only aspect of the County's post-verdict motion addressed by the district court.

A review of the record, however, reveals that the County clearly challenged the sufficiency of the evidence supporting a finding that the County's custom or policy had caused Ford's injuries in both its preverdict and post-trial motions. In its second motion for a directed verdict at the close of Ford's case, the defendants' attorney argued that Ford had failed to "establish[] a prima facie case on causation." Ford correctly notes that the County challenged the admission of Dr. Wilcox's deposition testimony as substantive evidence in its post-trial motion, but it also argued more

generally that "the evidence at trial failed to support Plaintiff's theory of causation." Indeed, the County's brief in support of its post-trial motion is almost identical to the causation section of the brief that it filed with this court. Ford also correctly points out that the district court characterized the County's post-trial motion as raising only the admissibility question, but the district court apparently misconstrued the County's motion in this regard.

Because the County properly preserved this issue in its preverdict and post-trial motions, we review the County's claim de novo. *See Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) ("We review a district court's denial of a Rule 50(b) motion de novo, applying the same deferential standard as the district court . . . ."). A motion for judgment as a matter of law may be granted "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003) (internal quotation marks omitted). In other words, "[t]he motion may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence. An appeals court is not to weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 544 (6th Cir. 2003) (citations and internal quotation marks omitted).

### 2. *Municipal liability under 42 U.S.C. § 1983*

Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of "[a]ny person acting under color of state law." 42 U.S.C. § 1983. Ford's legal theory was that both the jail officials and the County were deliberately indifferent to her serious medical needs, in violation of the Eighth and Fourteenth Amendments. "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Eighth Amendment, by its terms, applies only to post-conviction inmates. *Id.* Pretrial detainees, however, are guaranteed the equivalent right to adequate medical treatment by the Due Process Clause of the Fourteenth Amendment, and are subject to the same deliberate-indifference standard of care. *Id.*

"Mere negligence or malpractice is insufficient to establish an Eighth Amendment violation." *Bowman*, 350 F.3d at 544 (citing *Estelle*, 429 U.S. at 106 n.14). Instead, "[a] prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The objective component of the deliberate-indifference standard requires that the inmate have a "sufficiently serious" medical need such that she is "incarcerated under conditions posing a substantial risk of serious harm." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). In addition, the inmate must show "that the prison official possessed a 'sufficiently culpable state of mind . . . .' Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller*, 408 F.3d at 813 (quoting *Farmer*, 511 U.S. at 834-35).

The jury in the present case determined that none of the individual officers had met this standard of deliberate indifference. That determination is not before us on appeal. The standard to which individual officers are held, however, is relevant to the ultimate determination of whether a municipality can be held liable under 42 U.S.C. § 1983. *See Bd. of County Comm'rs v. Brown*, 520

U.S. 397, 405 (1997) (explaining, in the context of a municipal-liability claim, that "[i]n any § 1983 suit . . . , the plaintiff must establish the state of mind required to prove the underlying violation").

"A body politic is a 'person' within the meaning of § 1983." *Miller*, 408 F.3d at 813 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). But a municipality is not subject to liability pursuant to § 1983 on a theory of respondeat superior. *Monell*, 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. A plaintiff bringing a § 1983 claim against a municipality must therefore identify the policy or custom that caused her injury:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of County Comm'rs*, 520 U.S. at 403-04 (citation omitted).

At the outset, we note that § 1983 municipal-liability jurisprudence distinguishes between "policy" and "custom." *Compare Miller*, 408 F.3d at 813 ("Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986))), *with Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice."). But this distinction was not emphasized by the parties either in the district court or on appeal.

We also note that the parties disagree as to what exactly the County's relevant policy and/or custom was. Ford objects to the County's characterization of the relevant policy or custom as "allowing the weekend nurse to set her own weekend hours." She argues that "the totality of the circumstances" presented at trial includes the facts that (1) the part-time nurse was permitted to have a flexible schedule and was not required to inform the jail officials when she would be on-site, (2) no medical staff was required to be at the jail on the weekends, and (3) the officials were given discretion in determining how to make contact with the medical staff when a patient claimed a need for medication.

At oral argument, Ford's counsel acknowledged that County policy required one nurse to be on-call at all times, and that having a nurse on-call rather than on-site did not in and of itself create a constitutional problem. He also conceded that the policy of permitting a jail official to exercise discretion in deciding whether a nurse needed to be contacted to approve medication would not alone lead to municipal liability under § 1983. Rather, Ford's counsel honed in on the testimony of Sheriff Hall, the jail administrator, who testified at trial that he had policymaking authority and that, in his opinion, Deputy Sheriff Lansbach's decision to simply put Ford's Medical Screening Questionnaire into the nurse's inbox (as opposed to promptly contacting the on-call nurse) did not constitute a violation of the County's written policy, which mandates that when a new inmate "claim[s] a need for regular medications, a member of the medical staff must be contacted for approval." Ford's counsel also pointed out that he specifically relied on this testimony during his closing argument in order to show that the County's policy or custom exhibited deliberate indifference to Ford's serious medical needs.

We recognize that Sheriff Hall's trial testimony is in substantial tension with the plain language of the County's written policy, requiring that corrections officers must "contact" the medical staff when an inmate claims a need for medication. But Hall testified that he had policymaking authority and that he had the responsibility to "review and tweak [written policies], where needed." The County has never challenged Ford's assertion that Hall has final policymaking authority for the jail, and there exists no evidence in the record to suggest otherwise. *See Morro v. City of Birmingham*, 117 F.3d 508, 510, 515-16 (11th Cir. 1997) (acknowledging that "[u]nder our precedents, it is extremely doubtful that [the police chief] is a final policymaker . . . such that he may subject the City to § 1983 liability," but refusing to so hold because the city had failed to challenge the police chief's policymaking authority until after all of the evidence had been presented to the jury). We therefore conclude that a reasonable juror could find that Sheriff Hall's interpretation represented the County's policy with respect to weekend medical treatment and that, when viewed in the light most favorable to Ford, the County's policy permitted jail officials to "contact" medical staff by simply leaving a medical form in the nurse's inbox, even though this means that the nurse might not see the form until up to 48 hours later.

But identifying the County's policy constitutes only the beginning, rather than the end, of our inquiry. This is because

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of County Comm'rs*, 520 U.S. at 404 (emphasis in original).

The key inquiry thus becomes whether, in viewing the County's policy in the light most favorable to Ford, there was sufficient evidence for reasonable minds to find "a direct causal link" between the County's policy and the alleged denial of Ford's right to adequate medical care. *See, e.g.*, *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that municipality's policy or custom." (citing *Monell*, 436 U.S. at 694); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ("[T]o satisfy the *Monell* requirements[,] a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." (internal quotation marks omitted)).

The County relies primarily on *Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004), to support its argument that the record contained insufficient evidence for the jury to conclude that the County's policy was the direct cause of Ford's injuries. In *Graham*, Terance Graham had been arrested for possession of marijuana and had ingested about an ounce of cocaine shortly before being taken to jail. During a medical examination that was administered after Graham began acting erratically while at the jail, Graham told the nurse "that he had been drinking and using marijuana that evening and that he had asthma." *Id.* at 380. The nurse then gave him two doses of albuterol, an asthma medication that causes an accelerated heart rate. Graham, who continued to lie to the medical staff about having swallowed cocaine, eventually suffered multiple seizures and died. His estate brought a § 1983 action, claiming that he had been deprived of his constitutional right to adequate medical care while in police custody.

The court in *Graham* affirmed the grant of summary judgment in favor of the County, concluding that no evidence linked the alleged constitutional deprivation with a municipal policy. *Id.* at 384. As this court explained:

> Graham's argument is essentially that the County's policy did not, in this particular case, adequately address Mr. Graham's specific medical needs. That may be so. However, the fact that alternative procedures might have better addressed a prisoner's particular needs does not show that the County was deliberately indifferent to his medical needs.

*Id.* (alterations, citations, and internal quotation marks omitted).

In the present case, the County emphasizes that Ford herself testified that when she took Dilantin on a regular basis, it did not always control her seizures. The County also points to Dr. Wilcox's statement at trial that he could not state with a reasonable degree of medical certainty that promptly administering Dilantin would have prevented Ford from having a seizure on the afternoon in question. Ford, on the other hand, argues that Dr. Wilcox's deposition testimony—in which he stated that Dilantin would have been effective at preventing a seizure within several hours—was enough evidence for a jury to rely on in finding that the County's policy caused Ford's injuries.

We believe that, when viewing the evidence in the light most favorable to Ford, a reasonable jury could conclude that there was a direct causal link between the County's policy and the injuries that Ford suffered from her seizure and resulting fall. Dr. Wilcox's deposition testimony, which the jury was free to accept instead of his statements at trial, provided a basis for finding that Ford would not have suffered a seizure had she been given Dilantin within a few hours of her arrival at the jail. And in light of Sheriff Hall's testimony, reasonable minds could likewise find a direct causal link between the County's policy and the failure to get Ford her medication promptly.

As a final matter, we feel constrained to note that the County has missed the mark on appeal by focusing on the alleged lack of a causal link between the County's policy and Ford's injuries. A more promising defense would have been to challenge whether there was a direct causal link between the County's policy and an injury of *constitutional* magnitude suffered by Ford. *See, e.g.*, *Graham*, 358 F.3d at 382 (explaining that to impose municipal liability, a § 1983 plaintiff "must prove two basic elements: (1) *that a constitutional violation occurred*; and (2) that the County is responsible for that violation" (internal quotation marks omitted) (emphasis added)).

And although we conclude that there is sufficient evidence for a reasonable jury to find that the County's policy caused Ford's injuries, we are much less certain that the policy in question meets the stringent standard of deliberate indifference required to establish municipal liability in the first instance. *Cf. Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (concluding that the plaintiff's municipal-liability claim failed because there was no evidence that the city had either "a custom of denying medical treatment" to inmates or "notice of a clear and persistent pattern of such treatment" (internal quotation marks omitted)); *Miller v. Calhoun County*, 408 F.3d 803, 815-16 (6th Cir. 2005) (explaining that a showing of deliberate indifference "typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures," and rejecting a claim against the county where it had a policy requiring officers "to contact the on-call doctor in the event of a medical emergency," in part because the plaintiff had "failed to adduce independent evidence tending to show that such a policy was unreasonable"). The County in fact challenged the sufficiency of the evidence in this regard in its first motion for a directed verdict. But it did not renew such a challenge at any later stage of the case, having failed to make such a claim in either of its motions for judgment as a matter of law or in any of its arguments before us.

In short, the County abandoned its strongest argument—that the County's policy did not constitute deliberate indifference to Ford's serious medical needs. *See, e.g.*, *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir.1998) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal."). The County instead chose to rest its appeal on the alleged lack of a causal link between its policy and Ford's injuries. But the jury found otherwise, and we decline to disrupt the jury's verdict in the present case. *See Morro v. City of Birmingham*, 117 F.3d 508, 510, 515-16 (11th Cir. 1997) (refusing to overturn a $150,000 verdict in favor of a § 1983 plaintiff because the municipality had failed to contest the police chief's final policymaking authority until the charge conference, despite the acknowledgment that "[u]nder our precedents, it is extremely doubtful that [the police chief] is a final policymaker . . . such that he may subject the City to § 1983 liability").

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting. While I agree with much of the majority opinion, its end result can only be reached by an unnecessarily formalistic reading of the defendant's arguments. The theory upon which the majority upholds the jury verdict, refined at oral argument, is that a county policy permitted Lansbach's decision to put Ford's medical screening questionnaire into the nurse's inbox without promptly contacting the on-call nurse. Maj. Op. 11. No other aspect of the county policy, such as the part-time nurse's absence on weekends, is challenged. In order to permit recovery, the policy has to have amounted to deliberate indifference to prisoner medical needs. Yet the jury found that Lansbach in making that very decision was not deliberately indifferent to Ford's medical needs. Such an inconsistent result should not form the basis for liability against the county.

The technical justification for this result is that the county did not sufficiently anticipate this combination of decisions in its Rule 50 motion. The county did sufficiently move for a directed verdict on the basis that there was insufficient evidence that its policy was deliberately indifferent to prisoner medical needs. As the majority states, the defendant's attorney asserted that Ford had "fail[ed] to make out a prima facie case against the county" on a theory of deliberate indifference, and had not shown a (1) a causal link between the county's policy and the alleged constitutional deprivation or (2) a pattern of misconduct of which the county was aware. It is true that the argument presented at that point did not anticipate the particular combination that (1) the sole deliberately indifferent aspect of the county's policy would be that it permitted what Lansbach did, but (2) Lansbach was not deliberately indifferent. In my view, it is inconsistent with the liberal interpretation of Rule 50 reflected in *Kusens* to demand such prescience.

It is true that the county's brief on appeal does not make the argument in precisely these terms. But it was not until oral argument that the policies challenged by plaintiff were limited to countenancing Lansbach's specific actions. According to plaintiff's brief, the deliberately indifferent policies of the county also included permitting the weekend nurse to set her own schedule, not requiring the weekend nurse to notify the jail of her whereabouts, and not posting when medical staff would be present. Appellee's Br. 29-30. If there was enough evidence that these aspects of the county's policies were deliberately indifferent and caused plaintiff's injury, that would have been consistent with Lansbach's not having been deliberately indifferent. Thus, it made sense for defendant to argue that the policies were not deliberately indifferent, and that they did not cause the injury, without focusing on the possible inconsistency of the determination that Lansbach had not been deliberately indifferent.

In short, the county cannot be liable on the majority's theory unless Lansbach in particular was deliberately indifferent, and the jury found Lansbach not to have been deliberately indifferent. I would not uphold such an incoherent result.