ALICE M. BATCHELDER, Chief Judge,
dissenting.
Frank Horton’s situation is a sympathetic one. The neglect and lack of care he received while incarcerated is disturbing and Braswell’s crusade to seek justice for him is compelling. However, I cannot ignore the fact that Braswell has sued the wrong party. I respectfully dissent from the majority’s opinion.
It is well established that there is no respondeat superior liability under 42 U.S.C. § 1983. Monell v. Dep’t of Soc. Seros, of City of New York, 436 U.S. 658, 691-92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir.1999). A plaintiff must sue the actual individuals acting “under color of [law]” responsible for “the deprivation of any rights, privileges, or immunities secured by the Constitution and laws” of the United States. 42 U.S.C. § 1983. However, a municipality (or in this case, a private corporation acting under color of state law) can be held liable for its unconstitutional policies or customs. Miller v. Sanilac Cnty., 606 F.3d 240, 254-55 (6th Cir.2010); Little v. Corrections Corp. of Am., 103 Fed.Appx. 898, 900 (6th Cir.2004) (applying § 1983 to corporate defendant acting under color of state law). “Policy” and “custom” are two distinct concepts. See Ford v. Cnty. of Grand Traverse, 535 F.3d 483, 496 (6th Cir.2008) (“[W]e note that § 1983 municipal-liability jurisprudence distinguishes between ‘policy’ and ‘custom.’ ”). A policy refers to the “policies promulgated by the official vested with final policymaking authority for the municipality.” Miller v. Calhoun Cnty., 408 F.3d 803, 813 (6th Cir.2005). A custom, on the other hand, refers to an informal rule or way of doing things that “has not received formal approval through ... official decisionmaking channels.” Monell, 436 U.S. at 690-91, 98 S.Ct. 2018. The custom must “be so permanent and well settled as to constitute a custom or usage with the force of law.” Id. at 691, 98 S.Ct. 2018 (internal quotation marks and citation omitted). It must reflect a “[d]eeply embedded traditional way[] of carrying out ... policy.” Doe v. Claiborne Cnty., 103 F.3d 495, 507 (6th Cir.1996).
Most importantly, the proper policymak-ing officials must acknowledge and acquiesce in the custom. See Paige v. Coy- *630 ner, 614 F.3d 273, 284 (6th Cir.2010) (“[P]olicy or custom does not have to be written law; it can be created ‘by those whose edicts or acts may fairly be said to represent official policy.’ ”); Spears v. Ruth, 589 F.3d 249, 256 (6th Cir.2009) (“A municipality can be shown to have a ‘custom’ causing constitutional violations, even if that custom was not formally sanctioned, provided that the plaintiff offers proof of policymaking officials’ knowledge and acquiescence to the established practice.”); Gregory v. City of Louisville, 444 F.3d 725, 752 (6th Cir.2006) (“A city’s custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers.” (emphasis added)); Memphis, Term. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis, 361 F.3d 898, 902 (6th Cir.2004) (“A municipal ‘custom’ may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.”). While the language in these cases appears to be permissive, sometimes stating that custom “may” or “can” be established in this way, it is clear that this is a required element. See Monell, 436 U.S. at 694, 98 S.Ct. 2018 (“[I]t is when execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.”). In short, there must be at least knowledge and acquiescence by the official policymakers of the municipality or corporation. Requiring anything less would devolve into establishment of respondeat superior liability.
Braswell’s case fails because she has done nothing to connect any possible unconstitutional custom at the prison to the defendant Corrections Corporation of America (“CCA”). Braswell’s only plausible argument for the existence of a custom is that Assistant Warden Corlew instituted an informal policy that force would not be used except in emergency situations, and that the need to extract Horton from his cell for cleaning, hygiene, and mental health evaluation did not constitute an emergency situation. Officer Perry stated that “There was a constant cessation of the use of force on all inmates after [Assistant] Warden Corlew got there [in May 2007].” R.23-7 (Perry Dep.) at 24. Perry explained, “Corlew put the word out that we would not be using force under any, under any — unless it was an emergency, and then if the emergency occurred, it was still our fault and we’d still catch an ass chewing from it.” Id. at 22. But when asked whether or not Corlew explicitly stated any of that, Perry admitted, “He never put it out there like that, sir, but from the time he got there it was understood. It was one of them [sic] things where you all have lost control over this facility, I am here to put control back into this facility. All the cowboys, people that think they want to do it them way, can hit the door.” Id. Elsewhere, Perry testified that, “it was told to us that we were the top facility in the ... division for uses of force and that all uses of force was [sic] supposed to come down. I mean, there was supposed to be no force used unless it was the absolute last resort.” Id. at 6. Perry does not identify the source of this message.[1] But Perry later states that Corlew talked about the official, written CCA policy all the time, constantly emphasizing it, making sure it was followed at all times. Id. at 49. The official, *631 written policy explicitly authorized uses of force for certain circumstances, while stating the steps that should be taken prior to using force to address a situation. See infra. Following the written policy would not require a total cessation of the use of force.
Even assuming that Corlew’s directions amounted to a new, deeply embedded, unconstitutional way of doing things, what is ultimately fatal to Braswell’s claim is that she makes no connection between Corlew’s supposed new custom and the corporate defendant, CCA. Braswell does not submit any evidence that CCA had given official policymaking power to Corlew. She does not allege that any other officials above Corlew even knew about his new custom.[2] She does not even allege that Warden Gardner, Corlew’s supervisor, knew about his supposedly unconstitutional directions. And of course, a policymaker’s knowledge of Corlew’s custom is essential to his acquiescence in it. The record sheds no light on the chain of command at CCA, how policies are created, and who at CCA is authorized to make policy of this kind.[3] See Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir.1993) (holding that determination of official’s authority to make policy is dependent on relevant state and local law). Absent this, Braswell’s claim is simply one of respondeat superior liability.
The majority errs by glossing over the requirement that any custom be traceable to a policymaker. The words “knowledge” and “acquiescence” appear nowhere in the majority’s opinion. The majority does not claim that those elements are not required; it points to no cases in which we have ever held a municipal or corporate defendant liable for an unconstitutional custom under § 1983 without knowledge and acquiescence by a decisionmaking official. The majority simply ignores this requirement. This record, even viewed in the light most favorable to Braswell — as is required— contains no evidence to connect the alleged custom to any CCA policymaker.
The majority opinion appears to use “policy” and “custom” interchangeably, but those concepts are distinct. See Ford v. Cnty. of Grand Traverse, 535 F.3d 483, 496 (6th Cir.2008). Here, the majority can only be referring to custom, because as Perry testified repeatedly, CCA employees were violating CCA policy when they failed to remove Horton from his cell for several months. See R.23-7 (Perry Dep.) at 4, 5, 22, 55.
Furthermore, CCA’s official written policy on the use of force cannot possibly be unconstitutional. That policy states: “Every effort will be made to prevent and defuse situations that might require the use of force. If at all possible, non-forcible means, verbal intervention, negotiation, show of force, etc., will be attempted before using force as a last resort.” See id. at 48. Elsewhere, the policy states: “The amount and type of force used will be the minimum amount necessary to control the situation [or] individual, and then only as a last resort consistent with the safety of the public, staff and inmates.” Id. This is exactly the policy one would ordinarily expect a prison to have, and the lack of such a policy would undoubtedly open the door to even more prisoner complaints. Also unremarkable are CCA’s requirement that all uses of force be reported to its corpo *632 rate office, and its practice of keeping records of these reports and reviewing the uses of force with the Warden of each facility.[4] R.23-8 (Gardner Dep.) at 19, 22. Prisoners routinely raise Eighth Amendment claims about the use of excessive force, and these records are indispensable to the operation of a prison facility. But the keeping of these records is hardly an indication that CCA had a policy of using insufficient force in managing the prisoners in its charge.
In short, CCA has adopted a specific policy designed to reduce the chances that excessive force will be used in its prisons. The majority would now use that policy against CCA by holding that Assistant Warden Corlew’s failure to use force was the result of that policy, and that failure caused Horton’s injury. While it is entirely possible that such an insufficient force claim could have been brought on Horton’s behalf, it would have to have been brought against the proper defendants, that is, against the individuals who inflicted the injury by failing to use the requisite force, or against the policymakers who were responsible for the policy that resulted in that failure. But Braswell has brought this action only against CCA, and has presented evidence only that Corlew’s failure to require a necessary use of force against Horton was in violation of CCA’s policy that inmates be forced to regularly shower and clean their cells.
No doubt prison policymaking officials are unavoidably positioned between Scylla and Charybdis, that is, between permitting the use of too much force on the prisoners in their charge and not requiring the use of enough force. But we ought not further narrow that strait by holding, as the majority opinion does, that proof of an official policy of minimizing the use of force is enough to demonstrate an official policy of deliberate failure to use appropriate force. To survive a motion for summary judgment, Braswell was required to show evidence that Defendant CCA had a policy or custom that led to Horton’s injuries. She has not provided that evidence. Because this issue is dispositive, I would not address the exhaustion and physical injury issues.
This case is a difficult one, not because of the legal issues involved, but because of the stakes for the Plaintiff. For whatever reason, Braswell decided to sue CCA instead of the individual persons responsible for the alleged unconstitutional treatment of Horton, and this required her to demonstrate an unconstitutional policy or custom on the part of CCA. Perry’s testimony that *633 Corlew instituted a new way of doing things gave Braswell a glimmer of hope, but she has ultimately failed to carry the day, even on summary judgment, because she cannot attribute this custom to any policymaker in CCA. This issue has been ignored or treated cursorily throughout the entire litigation. The district court’s opinion merely stated, “Plaintiff articulates evidence that could suggest a CCA policy regarding Plaintiffs Eighth Amendment claims.” R.48 (Dist.Ct.Order) at 22. Braswell’s opening brief on appeal made no mention of any alleged policy; her reply brief stated that any discussion of “official policy or custom at this time is premature and irrelevant to Plaintiffs appeal,” Reply Br. at 14; and at oral argument, Braswell’s counsel addressed the issue only in the final minutes. The majority opinion continues this pattern by failing even to discuss any connection between the alleged custom and CCA. Our sympathy for Mr. Horton’s situation cannot permit us to ignore the law. I would affirm the district court’s order granting summary judgment to the defendant.

. Normally, one would think of the goal of reducing uses of force in a prison as a laudable one.

. Warden Gardner's testimony did establish that he met regularly with CCA Vice President Steve Corny and Managing Director Kevin Myers to discuss uses of force. R.23-8 (Gardner Dep.) at 22. This is unremarkable and should probably be regular operating procedure in any prison system.

. Perry did testify as to the chain of command within the prison, but that does nothing to establish who — if anyone in the corporately run prison — had policymaking authority. R.23-7 (Perry Dep.) at 17.

. The majority emphasizes the allegation that CCA uses the number of use-of-force incidents to determine bonuses and pay raises for CCA employees. Perry's testimony is vague and equivocal on this matter:
There is a — I’m not in the corporate structure and I don’t understand how they do it, but there is what's called zero tolerances at the facility, escape being one, rape ..., riots, ... escapes, hostage situations, and unnatural deaths, those things right there count against you majorly. They can be the difference between getting an $80 bonus check and a $500 bonus check. If you have any of those certain five things in a calendar year or a physical year, I don't know how they do it, you are toast as far as getting any kind of a substantial bonus. Other things come into play, you know, the budget, are you able to, you know, stay below budget, are you able to stay below use of force, are you able to keep certain inmates in school, you know, have them reporting to classes. And they track all of that and they reward you when you, you know, monetarily, when you do a good job, when you run the facility the way it need to be run.
R.23-7 (Perry Dep.) at 7. When asked later if the use of force to extract Horton from his cell would have affected bonuses, Perry simply responded, "It affected everything.” Id. at 22. Gardner stated only that uses of force "could be” a factor in determining his bonus. R.23-8 (Gardner Dep.) at 22-23.